FILED
2023 Aug-01 PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **GARRETT RHODES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,** ) ) ) ) ) | |
| **Plaintiff,** ) ) | **CIVIL ACTION CASE NO.:** **(CLASS ACTION)** |
| **v.** ) ) | |
| **BLUE DIAMOND GROWERS, a Cooperative,** ) ) ) | |
| **Defendant.** ) | |

## INDIVIDUAL AND CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## PARTIES

1.     Plaintiff Garrett Rhodes is a resident of Madison County, Alabama.

2.     Defendant is the largest cooperative of almond growers in the world, composed of over 3,000 grower/owners.

3.     Plaintiff has purchased the Product on one or more occasions within

the statutes of limitations period for each cause of action alleged, at stores located throughout Alabama.

## **FACTS**

4.     Plaintiff believed and expected the Product was processed in a smokehouse instead of having added liquid smoke flavor at the time of purchase.

5.     Plaintiff and the classes relied on the words, terms coloring, descriptions, layout, packaging, and/or images on the Product's labeling, statements, omissions, claims, and instructions, made by Defendant or at its direction, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

6.     Plaintiff bought the Product at or exceeding the referenced listed price.

7.     Plaintiff and the classes paid more for the Product than they would have if Plaintiff and the classes had known such was not enhanced in a smokehouse or with any real smoke but would have paid less or not purchased same at all.

8.     Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, features, and/or components.

9.     The Product was worth less than what Plaintiff paid, and he would not

have paid as much absent Defendant's false and misleading statements and omissions.

10.     Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition; i.e. such would truly be processed in a smokehouse.

11.     Presently, Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar almonds represented as smoked, because he is unsure whether those representations are truthful.

## JURISDICTION AND VENUE

12.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

13.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

14.     Plaintiff Garrett Rhodes is a citizen of Madison County, Alabama.

15.     Defendant Blue Diamond Growers is a California agricultural cooperative with a principal place of business in Sacramento, Sacramento County, California.

16.     The class of persons that Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

17.    The members of the class that Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described herein at thousands of locations, in the states covered by Plaintiff's proposed classes.

18.    The Product is sold in numerous sizes such as individual smaller pouches, large pouches, and tins, with identical misrepresentations.

19.    The Product is available to consumers from third-parties, which includes grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and/or online, in the States covered by Plaintiff's proposed classes.

20.    Venue is in this District is appropriate because a substantial part of the events or omissions giving rise to these claims occurred in Madison County, Alabama including Plaintiff's purchase, transactions, consumption and/or use of the Product and exposure to, awareness and/or experiences of and with the issues described here.

21.    Blue Diamond Growers ("Defendant") manufactures and sells almonds that Defendant represents as being processed in a smokehouse ("Product").

 

22.     The relevant front label representations (see above) include pictures of what appear to be smoked almonds, the name of "Blue Diamond Almonds" and the descriptive word, "Smokehouse."  These representations obviously are touting the almonds as having been enhanced by being naturally processed in a smokehouse.

23.     Contrary to the front label, the Defendant's Product is not processed in a smokehouse.  The Defendant is misleading consumers as it has Plaintiff.

## I.  SMOKING PROCESS

24.     Smoking is a method to enhance food by cooking and/or smoking it over a fire containing various kinds of wood chips thus exposing it to smoke.

25.     The drying action of the smoke and the different phenol compounds help to preserve protein-rich foods such as meat, cheese, almonds, and fish.  Wood

smoke provides unique and strong flavors, based on the type of wood used.

## II. "SMOKEHOUSE" DESCRIBES A PHYSICAL STRUCTURE FOR SMOKING FOODS

26.    Google Dictionary, based on its leading search engine which is designed to deliver the most relevant and accurate results, defines a smokehouse as "a shed or room for curing food by exposure to smoke."  The Britannica Dictionary defines it as "a shed or room for curing food by exposure to smoke."

27.    In a commercial smoking process, foods, such as almonds, are put on a large tray and slid into an enclosed structure, referred to as a smokehouse.  Thus, "smokehouse food" is a term of art meant strictly to refer to food cured, enhanced and/or cooked in an actual smokehouse.  This causes a common almond to become a premium almond in the market place.

28.    The earliest American smokehouses were in the Southern States, and made of humble materials like bricks and wood.

29.    As technology advanced, the modern smokehouse did as well.



30.    However, the present-day smokehouse performs the function where air movement applies the smoke and heat generated from burning hardwoods.



31.    The burning of wood inside the smoker box generates smoky non-volatile particulate matter that imparts the characteristic smoky taste to food.

### III.  CONSUMERS VALUE FOODS MADE THROUGH NATURAL PROCESSES LIKE SMOKING IN A SMOKEHOUSE

32.    The popularity of using smokehouses to smoke foods decreased in the mid-twentieth century due to the introduction of chemical preservatives and artificial smoke flavorings.[1]  Added smoke flavor is not only an issue of consumer health, but of quality and value.

---

[1] Matthew Sedacca, Liquid Smoke: The History Behind a Divisive Culinary Shortcut – Barbecue's love/hate relationship with the manufactured flavor, Eater.com, Jun 15, 2016.

33.     Whether a food has been smoked over hardwoods or contains liquid smoke, prepared by pyrolysis of sawdust, is basic front label information consumers rely on when making quick purchasing decisions at the grocery store.

34.     Research by Innova Market Insights confirmed that many normal consumers merely view the front label statement about a product's flavor, preferring foods which get their taste from the natural processes, such as smoking, by which the food is prepared.  Research indicates that 90% of consumers make a purchase after only a perfunctory viewing of the front of the packaging but without physically having the product in their hands.[2]

## IV.  BEYOND MISLEADING CONSUMERS, THE LABELING VIOLATES RELEVANT REGULATIONS

35.     Where a food's flavor does not come exclusively from a characterizing ingredient or processing method, but contains natural flavor derived from that ingredient or processing method, this must be disclosed to consumers on the front label, in addition to also being stated on the ingredient list. *See* 21 C.F.R. § 101.22(i).

36.     The misrepresentation of the Product with the term "Smokehouse" violates 21 U.S.C. § 343(a)(1), which deems food misbranded when the label contains a statement that is "false or misleading in any particular."

---

[2] Clement, J., *Visual influence on in-store buying decisions: an eye-track experiment on the visual influence of packaging design*, 23 **Journal of Marketing Management**, 917-928 (2007)

37.     The statement by Defendant of "Smokehouse" fails to reveal that the almonds have no connection to being smoked over hardwoods, neither in a smokehouse nor anywhere else.

38.     To recap, the Defendant's almonds are represented as processed in a smokehouse, even though they are not.  Defendant's product contains liquid smoke flavoring, which must be disclosed to consumers on the front label which it fails to do.

39.     Artificial flavoring methods are required to be revealed to potential customers.  The FDA has repeatedly warned companies that not disclosing the source of a food's smoked taste is misleading:

> If these smoke ingredients [natural smoke flavor] are added flavors, they should be declared in accordance with 21 CFR 101.22 [on the front of the label]; however, if these ingredients describe the smoking process, then they must not be listed as ingredients in the ingredient statement.[3] The FDA has cautioned that a label "should not include the term 'smoked'" or similar variations which misrepresent whether a food was subject to smoking, such as in a smokehouse.

40.      Federal and identical state regulations require that whenever food makes "direct or indirect representations" about its primary or "characterizing" flavor of added smoke, the source of that smoked taste is required to be disclosed

---

[3] FDA, Warning Letter, Smoked Seafood, Inc. dba Little Mermaid Smokehouse, MARCS-CMS 515739, June 27, 2017; FDA, Warning Letter, Walnut Creek Kitchens, Inc., CIN-15-436857-08, Nov. 27, 2014.

to consumers. 21 C.F.R. § 101.22(i).[4]

41.    Instead, foods like the Defendant's subject product which are not cooked or enhanced in a smokehouse should contain a prominent statement such as "'with added smoke flavor,' 'smoke flavored,' or with 'natural smoke flavor.'" Defendant's only prominent statement in that regard is that the almonds are falsely claimed to be from an actual smokehouse.

## V.  "SMOKEHOUSE" IS MISLEADING BECAUSE PRODUCT NOT PROCESSED IN A SMOKEHOUSE

42.    The sole meaning of "Smokehouse" goes directly to the smoke-infused process by which a food is prepared, without any qualifying or clarifying language.  Thus, consumers reasonably expect that the smoked Product is to have been subjected to smoke curing/enhancement in a smokehouse.

43.    Instead, after falsely representing to customers that the product went through a smokehouse, the Defendant's post on the label that the ingredients include "NATURAL HICKORY SMOKE FLAVOR," which is defined as "smoke condensed into a liquid form."  The label states:


INGREDIENTS: ALMONDS, VEGETABLE OIL (CANOLA SAFFLOWER AND/OR SUNFLOWER), SALT, CORN MALTODEXTRIN, NATURAL HICKORY SMOKE FLAVOR, YEAST, HYDROLYZED CORN AND SOY PROTEIN, NATURAL FLAVORS.

---

[4] Except for minor and irrelevant exclusions, pursuant to Ala. Admin. Code r. 420-3-20-.02 (Ala. Admin. Code [2021 Ed.]), Alabama has adopted as law in Alabama all regulations and statutes under the Federal Food, Drug and Cosmetic Act ("FFDCA") and implementing regulations.

44.    The Product uses "NATURAL HICKORY SMOKE FLAVOR" to try and make the almonds taste like they were processed in a smokehouse, even though they were not.  Natural or artificial hickory smoke flavor is not from a smokehouse, not infused with smoke and is deceptive.

## VI.  REAL SMOKED ALMONDS ARE COMMON FOOD

45.    Even if Plaintiff and consumers viewed the ingredient list, they would have no reason to know that listing "natural hickory smoke flavor" forecloses the possibility the Product was also subject to smoking in a smokehouse.

46.    Upon information and belief, it is cheaper, quicker and more productive for Defendant to opt for smoke flavoring rather than the real thing of smoking.  Several steps must be used to produce a real smoked product.  Such includes (1) soaking in a brine solution, followed by (2) roasting in oils and (3) depositing into a wire mesh basket and (4) inserted into a smoker for several hours.  None of this lengthy procedure is required just to insert a smoke flavoring, the cheaper commercial route.

47.    Almonds that are smoked in a smokehouse actually exist in the marketplace and are not technologically or otherwise unfeasible to produce as shown by the example on the following page of Hickory Smoked Almonds, printed across an image of a smokehouse.



48.    Such true products are labeled identically to the Defendant's misrepresented Smokehouse Almonds.

49.     When Defendant's competitors package almonds that are not truly smoked but which only have a "smoked taste" due to added smoke flavor, competitor brands truthfully disclose such fact on the front label, such as "Smoked Almonds – Naturally Flavored" (Planters) and "Natural Smoke Flavored Almonds With Other Natural Flavors" (Walmart Great Value brand) in contrast to Defendant's "Smokehouse Almonds" (left below) *See* 21 C.F.R. § 101.22(i)(1)(i); 21 C.F.R. § 101.22(i)(1)(iii).

  

50.     The disclosure on a front label of whether a food is smoked in a smokehouse or only has added smoke flavor is basic information on which consumers rely when making quick purchasing decisions at the store.

51.     Consumers are misled because the absence of qualifying terms such as "naturally flavored" or "natural smoke flavored almonds" gives consumers the false impression that the Product was made in a smokehouse.

## VII.  ADDED SMOKE FLAVOR IS NOT EQUIVALENT TO BEING MADE IN A SMOKEHOUSE

52.     Scientists have concluded that there are at least 400 flavor compounds which are created when foods are made in a smokehouse.

53.     These include pyrazines, aliphatic, aromatic hydrocarbons, alcohols, organic acids, esters, furans, phenols, carbonyl and non-carbonyl compounds, and various oxygen- and nitrogen-containing heterocyclic compounds.

54.     Additionally, added smoke flavor is unable to make the Product taste like it was processed in a smokehouse for several reasons.  First, added smoke flavoring lacks the delicate balance of phenolic compounds, including 2,3-Butanedione, 2,3-Pentanedione, 3-Butanoic acid, 3-Methylbutanoic acid, 4-Ethylguaiacol, 4-Propylguaiacol and/or 4-Vinylguaiacol.

55.     Second, inside a smokehouse, the smoke generation process dramatically influences the wood-smoke chemical composition, generating compounds that are not capable of being included in a "natural smoke flavor," like

trans-isoeugenol and 4-methylsyringol.  When foods like almonds are exposed to volatile and particulate matter in a smokehouse, they undergo chemical reactions which form new flavor compounds.

56.    Third, certain compounds only serve as intermediates in the formation of more stable forms of compounds which are essential to the aroma of smoke.

57.    Fourth, in most systems which seek to imitate a smokehouse, there is only a focus on volatile compounds which are believed to have distinctive odor properties at low concentrations.

58.    This overlooks the nonvolatile compounds which significantly contribute to smoke flavor.

## VIII.  CONCLUSION

59.    Defendant makes other representations and omissions with respect to the Product which are false and misleading.

60.    Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

61.    The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

62.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the

expense of consumers.

63.    Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

<u>**Class Allegations**</u>

64.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

65.    Plaintiff brings this case individually, and as a class action, pursuant to R. 23, Fed. R. Civ. Proc., on behalf of all persons who have purchased Defendant's product in the United States and Alabama as covered immediately below.

66.    Plaintiff seeks to represent the following Class:

- **All persons residing in Alabama, California, Florida, Illinois and Missouri who purchased all forms of Defendant's product in the last six (6) years, hereafter called the "Regional Class,"**

and the following sub-class:

- **All persons residing in the State of Alabama who purchased all forms of Defendant's product in the last six (6) years, hereafter called the "Alabama Class."**

Excluded from the Class are the following:

i.    Any and all federal, state, or local governments, including but not limited to their department, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

ii.    Individuals, if any who timely opt out of this proceeding using the correct protocol for opting out;

iii.    Current or former employees of Defendant;

iv.    Individuals, if any, who have previously settled or compromised claim(s) relating to Defendant's product; and

v.    Any currently sitting federal judge and/or person within the third degree of consanguinity to any federal judge.

67.   Plaintiff seeks a judgment on a Class-wide basis for himself and the Class[5] under the following counts.

68.   Defendant violated the rights of each Member of the Class in the same fashion based upon Defendant's uniform actions in its marketing, producing, selling, design and distributing of its Defendant's product.

69.   Plaintiff should be approved to maintain this action as a class action for the following reasons:

70.   **Numerosity:**  Members of the Class are so numerous that individual joinder is impracticable.  The proposed Class contains thousands of Members.  The

---

[5] Whenever "class" is referred to, such shall include both the Regional Class and the Alabama sub-class.

Class is therefore sufficiently numerous to make joinder impracticable, if not impossible.

71. **Common Questions of Fact and Law Exist:**  Common questions of fact and law exist as to all Members of the Class, including whether Defendant marketed, designed, produced and distributed the Product with its representations, implied and expressed warranties and breaches of agreement in fact and implied.

72. **Typicality:**  Plaintiff's claims are typical of the claims of the Class. State and federal food law form the framework of Defendant's legal requirements as reasonable and necessary standards by which Defendant is to comply. Violations of same impose the stated causes of action.  Furthermore, Plaintiff and all Members of the Class sustained monetary and economic injuries arising out of Defendant's unlawful conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all putative Class Members.

73. **Adequacy:**  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class – all seek redress and prevention for the same unlawful conduct.  Plaintiff has retained Counsel who is competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.  Plaintiff's claims, like those of the Class, are antagonistic to Defendant.

74.    **Predominance:**  Common questions of fact and law predominate over any questions affecting individual Class Members.

75.    **Superiority:**  A class action is superior to other available means of fair and efficient adjudication.  The injury suffered by each individual Class Member is very small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be impossible for all Members of the Class to effectively redress the wrongs done to them on an individual basis.  Therefore, a class action is the only reasonable means by which Plaintiff and the Class may pursue their claims.  Moreover, even if the Members of the Class could pursue such individual litigation, the court system could not.  Individualized litigation increases the delay and expense to all parties, and to the court system, by the complex legal and factual issues of this case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I

### DECEPTIVE PRACTICE STATUTES

### (On Behalf of the Plaintiff and the Class)

76.    Plaintiff adopts paragraphs 1. through 75. as if fully set out herein.

77.    Mr. Rhodes, for himself and on behalf of the class and subclass,

brings this action under the consumer protection statutes of the following states:

a.     Alabama Deceptive Trade Practices Act, ALA. Code § 8-19-1, *et. seq.*;

b.     California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et. seq.* and Unfair Competitive Law, Cal. Bus. Prof. Code §§ 17200 – 17210 *et. seq.*;

c.     Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes*§ 501.201, *et. seq.*;

d.     Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;

e.     Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;

78.     Defendant's acts, practices, labeling, advertising, packaging, representations and omissions, while unique to the parties, have a broader impact on the public.

79.     As reasonable consumers, Plaintiff and class members desired to purchase the Product with the reasonable assumption that the subject goods complied with applicable law, regulations and the represented contents, when such did not; Defendant is guilty of marketing said goods:

- so that such causes confusion or misunderstanding as to the source,

sponsorship, approval or certification of goods or services;

- by representing that said products have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have;

- by representing that said goods are of a particular standard, quality or grade;

- by marketing the said goods in violation of law;

- by engaging in an unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce; and

- by representing said products are of a quality that they are not.

80.   After sending on May 24, 2023 a claim notice to Defendant, pursuant to law and not receiving any constructive response, Plaintiff asserts a statutory claim under the Alabama Deceptive Practices Act, Code of Alabama, §§ 8-19-1, et seq. and the aforementioned statutes of all other named states.

81.   By engaging in the aforementioned unlawful and deceptive acts, Defendant caused monetary damage to Plaintiff and a class of similarly situated persons by engaging in a trade or commerce harmful to Plaintiff and the putative class.

82.   Plaintiff individually and on behalf of the class requests the following relief:

a.    the relief and damages allowed by each jurisdiction of the residences

of each putative class member; including but not limited to any allowed multiple of

damages;

b.    appropriate injunctive relief;

c.    attorneys' fees and costs; and

d.    such other, further and general relief for which Plaintiff and the class

might be equitably qualified.

## COUNT II

### BREACH OF CONTRACT

### (On Behalf of the Plaintiff and the Class)

83.    Plaintiff realleges and incorporates by reference the preceding

paragraphs numbered 1. thru 75. of this Complaint as if fully set forth herein.

84.    Plaintiff and the class members entered into implied agreements with

Defendant.

85.    The agreements provided that Plaintiff and the class members would

pay Defendant for its product.

86.    The contracts further provided that Defendant would provide Plaintiff

and the class members subject product as required by law with contents

commensurate with its container's representations.

87.    Plaintiff and the class members paid Defendant for the product that they purchased, and satisfied all other conditions of the agreements.

88.    Defendant breached the implied agreements with Plaintiff and the class members by failing to comply with the material terms of providing the product as represented by Defendant.

89.    As a direct and proximate result of Defendant's breach, Plaintiff and the class members have been injured and have suffered actual damages due to the product being not as represented.

**COUNT III**

**WANTONNESS**

**(On Behalf of the Plaintiff and the Class)**

90.    Plaintiff realleges and incorporates by reference the preceding paragraphs numbered 1. thru 75. of this Complaint as if fully set forth herein.

91.    Plaintiff claims that Defendant in a wanton manner has marketed and is marketing to Plaintiff and the class the products heretofore mentioned.

92.    Plaintiff claims that said marketing of the subject product without regard to the legal requirements, was done and is presently continuing in a wanton manner and as a proximate result thereof, the Plaintiff and the class were/are damaged as herein claimed.

93.   Plaintiff further alleges that said marketing by Defendant of misbranded product in a wanton manner, is violative of legal requirements throughout the United States and should be restrained and be caused to cease, as hereinafter and heretofore claimed.

94.   Plaintiff prays that due to the damage proximately caused by Defendant to Plaintiff and the class that punitive monetary relief is also demanded as hereinafter requested.

## COUNT IV

### CLAIM FOR INJUNCTIVE RELIEF

### (On Behalf of the Plaintiff and the Class)

95.    Plaintiff realleges and incorporates by reference the preceding paragraphs numbered 1. thru 75. of this Complaint as if fully set forth herein.

96.    Plaintiff and the putative class, need and are entitled to, an order for declaratory relief declaring that Defendants' sales practices alleged herein violate the Alabama Food Code, and federal food regulations, as provided herein and by declaring that the aforementioned refusal by Defendants to follow the applicable law is in violation of the requirement to print only the true nature of the product on the product and its promotional material.

97.     Defendant is presently continuing each of these complained-of practices in Alabama and the United States.  Plaintiff has previously served legal notice on Defendant to comply with legally required labeling as described above. Defendant has refused and continues to knowingly ignore such responsibility. This matter should be settled and a declaratory judgment will assist in same.  Plaintiff therefore alleges that the requested declaratory judgment is in the public interest.

98.     Plaintiff on behalf of the class has a significant interest in this matter in that each has been, and will again in the future, along with putative class members, be continuously subjected to the unlawful policies and practices alleged herein.  As with Plaintiff, members of putative class are continuously and unwittingly subjected to the Defendant's knowing disregard of the Alabama Food Code, the laws of the states where putative class members other than Alabama residents reside, and FDA regulations and are regularly subjected to Defendant's deceptive marketing.

99.     Further, Plaintiff alleges on behalf of the afore-mentioned putative class that class members routinely purchase products from Defendant and are entitled to know that the purported product will legally display its true contents at the time of purchase.  Until a change is legally declared, Plaintiff and members of the public will be regularly subjected to Defendant's intentional deception and otherwise unlawful conduct which is alleged herein and will be subject to such in the future.

100.    Based on the foregoing, a justiciable controversy is presented in this case, rendering declaratory judgment appropriate.

### V.  Breaches of Warranty,
### Implied Warranty of Merchantability/Fitness for a Particular Purpose and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

101.    Plaintiff realleges and incorporates by reference the preceding paragraphs numbered 1. thru 75. of this Complaint as if fully set forth herein.

102. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was processed in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

103.    Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

104.    Defendant knew that the product's represented attributes were such that potential customers like Plaintiff were seeking and deceptively developed its marketing and labeling to directly meet those needs and desires.

105. Defendant's representations about the Product were conveyed in writing and promised such would be as represented, and Plaintiff and the class understood this meant that it was processed in a smokehouse instead of having added liquid smoke flavor, even though it was not processed in a smokehouse.

106.    Defendant's representations affirmed and promised that the Product was processed in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

107.    Defendant described the Product so that Plaintiff and consumers/class believed it was processed in a smokehouse instead of having added liquid smoke flavor, even though it was not processed in a smokehouse, which became part of the basis of the bargain that it would conform to its affirmations and promises.

108.    Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

109.    This duty is based on Defendant's outsized role in the market for this type of Product, the leading name in almonds, trusted by consumers to make and sell almond products truthfully.

110.    Plaintiff only recently became aware of Defendant's breach of the Product's warranties.

111.    Plaintiff has provided notice to Defendant of this claim.

112.     Plaintiff hereby provides further notice to Defendant that it breached the express and implied warranties associated with the Product.

113.    The Product did not conform to its affirmations of fact and promises due to Defendant's deceptive actions.

114.    The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it was processed in a smokehouse instead of having added liquid smoke flavor, even though it was not processed in a smokehouse.

115.    The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it was processed in a smokehouse instead of having added liquid smoke flavor, even though it was not processed in a smokehouse, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

116.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known thereby suffering damages.

## **Jury Demand and Prayer for Relief**

**WHEREFORE**, Plaintiff prays for judgment:

1.    Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.    Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.    Injunctive relief to remove, correct and/or refrain from the challenged

practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.      Awarding monetary damages, statutory and/or punitive damages pursuant to subject statutory claims and interest pursuant to the common and statutory law;

5.      Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.      Grant such other, further, general and punitive relief as is deemed just and proper.

Dated:      August 1, 2023                    /s/ *Charles M. Thompson*
                                              Charles M. Thompson
                                              **CHARLES M. THOMPSON, P.C.**
                                              101 Mohawk Drive
                                              Trussville, AL 35173
                                              Telephone: (205) 995-0068
                                              Facsimile:  (866) 610-1650
                                              E-mail:  cmtlaw@aol.com

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

                                              /s/ *Charles M. Thompson*
                                              Charles M. Thompson
                                              Attorney for Plaintiff

**SERVE DEFENDANT via certified mail at this address:**

**Blue Diamond Growers**
c/o C T Corporation System
330 N Brand Blvd Ste 700
Glendale CA 91203-2336